IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| John Brown, | : | |
| Plaintiff, | | Civil Action 2:13-cv-416 |
| | : | |
| v. | | Judge Watson |
| | : | |
| Commissioner of Social Security, | | Magistrate Judge Abel |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Plaintiff Steven Brown brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying his applications for Social Security Disability and Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the administrative record and the parties' merits briefs.

**Summary of Issues.** Plaintiff Brown maintains that he became disabled on December 1, 2000, at age 41, due to a face injury/breathing problems and chronic back/leg pain. (*PageID* 207.) Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- the administrative law judge abused his discretion by failing to give proper weight to the opinions of the examining physicians regarding Brown's psychological limitations; and

- the administrative law judge's determination that Brown can perform work at all exertional levels is unsupported by substantial evidence.

*See* Doc. 11.

**Procedural History.**  Plaintiff Brown protectively filed his application for disability insurance benefits on November 10, 2009 and supplemental security income on October 26, 2009,  alleging that he became disabled on December 1, 2000, at age 41. (*PageID* 171-77.)[1]  The applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.  On December 6, 2011, an administrative law judge held a video hearing at which Plaintiff, represented by counsel, appeared and testified.  (*PageID* 84-111.)  A vocational expert also testified. (*PageID* 112-19.)  On December 23, 2011, the administrative law judge issued a decision finding that Brown was not disabled within the meaning of the Act.  (*PageID* 60-73.)  On March 5, 2013, the Appeals Council denied Plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (*PageID* 51-55.)

**Age, Education, and Work Experience.**  Brown was born on January 10, 1959. (*PageID* 72, 192.)  He has a high school education.  (*PageID* 212.)  Brown has no past relevant work other than sporadic work activity through businesses owned by either his brother or a friend.  (*PageID* 86-89, 208.)

---

[1]The record does not contain Brown's application for Supplemental Security Income benefits.

**Plaintiff's Testimony**   Brown testified at the administrative hearing that since his accident[2], he has difficulty keeping his attention, he finds reading difficult and has to read the same paragraph three or four times.  (*PageID* 85.)

Brown acknowledged that because of his accident in 1993, he received Social Security Disability until 2000.  (*PageID* 86.)  He testified that he has "not really" had any work activity since that time, noting that he went to work at a business owned by his brother and it was a way for his brother to help him out.  *Id.*

Brown testified that he cannot work because he can't sit or stand for more than ½ hour and he gets short of breath.  (*PageID* 90.)  He felt that his mental health was his biggest problem.  *Id.*  He has back and leg pain and he has to sleep in a chair sitting up. Brown noted he has constant build up in his sinuses, with discharge, "which is extremely embarrassing."  *Id.*  He doesn't want to be in public anymore and just stays home in his parents basement.  *Id.*

He also testified to suffering from panic attacks during which he breaks out in a cold sweat.  (*PageID* 91.)  He reported crying "for no reason."  *Id.*  He has recurring nightmares of the accident with "the fence post coming through and sticking in my face and then I just can't breathe."  *Id.*  His nightmares occur about four times a week which is why he explained he only sleeps two hours at time for a total of six hours a night.  He

---

[2]Plaintiff was involved in a motor vehicle accident on December 17, 1993 in which he sustained a midfacial fracture.  *PageID* 86, 407.

takes medication which helps him fall asleep but it does not keep him asleep.  (*PageID* 93.)

He has lived in his parents basement for seven years.  He spends the majority of his time in his room in the basement.  (*PageID* 92.)

Brown's sinus problem and hearing problem stem from the motor vehicle acci-dent.  He has pain in his back, neck, both legs and right thigh.  Brown described his thigh pain as a constant burning sensation and he rated his thigh pain at a level of 8 on a 0-10 visual analog scale.  (*PageID* 94-96.)  He also testified to dental damage from the accident.  At the time of hearing he had a new set of teeth but had to hold them in with his tongue.  He uses a different prosthesis to eat with.  (*PageID* 97.)  He can't chew and eats soft foods.  (*PageID* 97-98.)

Brown estimated that he can walk about 15 minutes; his legs start to ache and he gets short of breath.  (*PageID* 98.)  When he sits, his back begins to hurt.  (*PageID* 99.)  He also reported problems with his left shoulder (a "catch") and numbness and weakness in his right wrist.  (*PageID* 101.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize the relevant evidence.

**Physical Impairments.**

4

Family Health Center: Ahmed Mosalem, M.D./Summit Sharma, M.D.   Brown established care at Family Health Center on November 18, 2008 with Dr. Mosalem. Brown reported a history of his motor vehicle accident with midfacial fracture.  He went through 67 surgeries.   He was disabled for sometime. After his surgeries, Brown was released to go back to work.  Brown requested a statement from Dr. Mosalem stating that he could work with no limitation.  Brown also reported at that time that he had been working for the previous five years.  He denied any complaints that day.  He did not take any medicines.  He had no other significant past medical history.

On physical examination, Dr. Mosalem noted Brown had multiple scars of the face, especially in the upper lip.  His nose seemed to be depressed status post reconstructive surgery.  Brown was edentulous.  He had upper and lower dentures.  Neck was supple.  Extremities had no edema.  The neurological examination showed Brown was alert and oriented x3 with adequate thought content.  Motor power was 5/5 bilaterally and symmetrical.  Deep tendon reflexes were 2/2 bilaterally and symmetrical. Extremities had intact sensation with normal plantar reflex.  Dr. Mosalem assessed that Brown had no physical or mental limitation.  He was employable at that point.  (*PageID* 407.)

When seen by Dr. Mosalem in January 2009, Brown complained of pain in both legs and thighs.  He noted that the pain was intermittent, but lately it had been increasing in intensity, especially at night.  He rated the pain at a 6-7 on a 0-10 visual analog scale.  On examination, Dr. Mosalem found mild spasm of paraspinals muscles, full

5

range of motion of the lumbar spine, hips and knees, no tenderness in the spine, a neg-

ative straight leg raise test.  Lower extremity examination revealed hypoesthesia in the

lateral aspect of the left thigh all the way down to the knee.  Deep tendon reflexes were

½ at both knees and none were elicited in ankles bilaterally.  Dr. Mosalem ordered

x-rays of the lumbar spine, pelvis and an EMG of both lower extremities.  (*PageID*

405-06.)

In May 2010, Brown was seen by Dr. Sharma for a basic medical examination to

receive a medical card.  Dr. Sharma reported Brown's history of the motor vehicle acci-

dent and the 67 surgeries he had following that accident.  Brown reported that after

many surgeries, he was eventually released to go back to work.  He requested that Dr.

Sharma complete a medical assessment form based on his complaints of lower back

pain.  Examination results showed equal power in his arms and legs and scars from his

facial reconstruction.  Dr. Sharma concluded that, "He has moderate limitations in his

ability to push and pull, bend, reach and do repetitive foot movements.  He also has

difficulty bearing weight as well as sitting and standing for long hours."  (*PageID* 404.)

The record shows that Brown continued to treat with Dr. Sharma through at least

October 2011.  During that time, he had complaints of major depression, chronic low

back pain and symptoms of radiculopathy.  Dr. Sharma noted that Brown received

Ambien, Celexa and Buspar from the Paint Valley clinic.  (*PageID* 398-413, 433-37.)  In

October 2011, Dr. Sharma noted that Brown was "feeling better," and that his blood

pressure, anxiety, and depression were all stable on medication.  Brown's hip pain was

improving with an injection, and he concluded that Brown "seems to be improving with his overall health."  (*PageID* 433.)

<u>Southern Ohio Medical Center</u>  Brown underwent an audiology evaluation on September 15, 2009, which concluded that he had speech awareness thresholds at 50 dB in the right ear and 85 dB in the left ear.  Speech discrimination was 92% in the right ear and 68% in the left ear.  He had moderate sensorineural hearing loss in the right ear and severe to profound mixed hearing loss in the left ear.  (*PageID* 311.)

<u>Phillip Swedberg, M.D.</u>  On January 13, 2010,  Brown was consultatively examined by Dr. Swedberg on behalf of the state agency.  (*PageID* 313-21.)  Brown described his 1993 motor vehicle accident and noted that he sustained "complete mid facial fracture" as well as bilateral pelvic fractures.  He reported that he had been hospitalized for two months and had undergone "sixty-seven separate facial reconstruction surgeries" that required multiple bone and skin grafts.  His last surgery was approximately five years prior when he had a prosthesis fit for his upper jaw which does not fit well and falls out.  Brown reported to Dr. Swedberg that he had to hold "my teeth in place" when he talked.  Brown also reported hearing loss (left worse than right). He wore bi-lateral hearing aids.  He also had lower extremity pain as well as "pins and needles" in his upper thighs.  Brown also occasionally aspirated food into his sinuses. Brown further complained of low back and shoulder pain which he attributed to "bone and muscle they took to repair my face."  Brown reported he took no medication.  (*PageID* 317.)

7

On examination, Brown demonstrated a normal gait, without the need for an ambulatory aid, and he was comfortable both sitting and standing.  (*PageID* 318.) Brown had a normal memory, intellectual functioning, and orientation.  *Id.*  Dr. Swedberg  noted Brown had 5/5 strength in all muscle groups, with no atrophy or tenderness, and full sensation and normal reflexes.  (*PageID* 313-16, 318-19.)  Brown also had normal range of motion in all joints except his left shoulder where he was unable to lift his left arm overhead.  (*PageID* 320.)  Dr. Swedberg concluded that Brown was capable of a "mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects."  Brown also had difficulty reaching overhead with his left arm, but had no difficulty grasping and handling objects.  *Id.*

Southern Ohio Oral and Facial Surgeons/Richard Shoemaker, DMD.  Brown treated with Dr. Shoemaker from December 27, 2010 through at least March 10, 2011. (*PageID* 372-73, 414-17.)  Dr. Shoemaker prepared a narrative to Caresource on October 20, 2011, noting that,

> [Brown] presented to my office in December 2010 with a facial space infection, failing implants and non-functional prosthesis.  Multiple implants, foreign bodies, carious teeth infections were removed and treated.  The pathology/failing implants have resolved and he is ready for a new dental reconstructive effort.  Due to his grossly altered anatomy, no conventional maxillary denture is possible.  He needs six to eight viable dental implants to have any retention or function of his new maxillary prosthesis. This is medically necessary as he has no masticatory ability, dysphagia and severe speech defect without his prosthesis in place.

 (*PageID* 416.)

8

    <u>W. Jerry McCloud, M.D./Anthony Hammond, M.D./S. Gupta, M.D.</u>  On March 15, 2010, Dr. McCloud, a state agency physician, conducted a physical residual functional capacity assessment based on Brown's record.  (*PageID* 322-29.)  Dr. McCloud found no exertional limitations.  (*PageID* 323.)  He noted Brown would be limited to no overhead reaching with his the left arm.  (*PageID* 325.)  Brown should avoid noisy environments or activities that require ongoing conversation.  (*PageID* 326.)  Dr. McCloud concluded that Brown's symptoms were attributable to a medically determinable impairment; and his allegations were fully credible.  (*PageID* 327.)  Dr. McCloud assigned great weight to Dr. Swedberg's opinion.  (*PageID* 328.) Another state agency physician, Anthony Hammond, M.D. performed a otolaryngology review and affirmed Dr. McCloud's assessment in July 2010.  (*PageID* 346.)

    An orthopedic review was also performed in July 2010 by S. Gupta, M.D. (*PageID* 347.) Dr. Gupta affirmed Dr. McCloud's assessment, noting that there was no "worsening of his orthopedic problems" and his "muscle power is normal." *Id.*  Dr Gupta found that Brown's back/leg pain was not credible since his physical examination was "essentially within normal limits," he had a normal gait, and was not taking pain medication.  *Id.*  Dr. Gupta also noted that a medical source statement completed by Dr. Sharma was based on subjective complaints rather than objective evidence.  *Id.*

    <u>Michael Jones, D.O.</u>  Dr. Jones performed an EMG of both lower legs on March 23, 2011 which was abnormal and revealed a mild right sural mononeuropathy but no radiculopathy, plexopathy, or polyneuropathy.  When examined in April 2011, Dr.

Jones found Brown's hearing to be intact, walking was normal, and despite "give-way weakness of both upper and lower extremities," Dr. Jones thought he had normal strength, bulk and tone, with no atrophy.  Dr. Jones felt based on Brown's presentation, he might have restless leg syndrome.  (*PageID* #377-79.)

When seen in follow-up in October 2011, Dr. Jones found that Brown was showing some reduction of the burning in his thigh as a result of injections.  (*PageID* 438-39.)

**Psychological Impairments.**

John S. Reece, Psy.D.  Dr. Reece performed a consultative psychological examination at the request of the state Bureau of Disability Determination on July 29, 2010.  (*PageID* 349-52.)  Brown denied having friends and reported no involvement in structured social activities.  (*PageID* 349.)  Brown also reported no problems getting along with co-workers or supervisors in the past.  During the mental status exam- ination, Dr. Reece found that Brown was cooperative and appropriately dressed.  He had good eye contact.  His affect was constricted and mood was mildly anxious/ dysphoric.

Brown reported feeling depressed, having thoughts of suicide, problems with sleep, feeling hopeless, helpless and worthless.  He felt anxious and nervous in public. He reported sudden panic attacks with chest pain, shortness of breath, nausea and sweating  and indicated he stayed home to avoid experiencing such attacks in public. He had traumatic dreams of his automobile accident.  (*PageID* 350.)

10

Brown exhibited poor delayed memory and auditory recall, but fair immediate memory.  His concentration, persistence, and pace were satisfactory.  Dr. Reece diagnosed Brown with Post Traumatic Stress Disorder ("PTSD"); depressive disorder and an anxiety disorder.  He assigned Brown a Global Assessment of Functioning ("GAF") score of 55, indicative of moderate to significant impairment.  (*PageID* 351.)

In Dr. Reece's opinion, Brown was mildly impaired in his ability to relate to others but not impaired in his abilities to understand and follow simple instructions and maintain attention for simple repetitive tasks.  Dr. Reece found that Brown's ability to withstand stress and pressure of daily work was markedly impaired.  (*PageID* 352.)

John Waddell, Psy.D.  On August 25, 2010, Dr. Waddell, a state agency psychologist, reviewed the record and reported that Brown had the medically determinable impairments of a depressive disorder and an anxiety disorder.  These impairments were not severe.  (*PageID* 356, 358.)  In Dr. Waddell's opinion, Brown was mildly limited in his activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had no episodes of decompensation.  (*PageID* 363.)  Dr. Waddell further found that the evidence did not establish the presence of the "C" criteria.  (*PageID* 364.)

In his narrative assessment of Brown's ability to engage in work-related activities from a mental standpoint, Dr. Waddell asserted that Brown's allegations were only partially credible.  He gave weight to the conclusions of Dr. Reece, with the exception of Reece's finding that Brown's ability to relate to others and stress tolerance was marked-

11

ly impaired.  Dr. Waddell observed that while Brown had the ability to relate well, he was self-conscious about his facial reconstruction and socially withdrawn.  This would affect his ability to function in a work setting and could lead to marked limitations in stress tolerance.  However, Dr. Waddell opined that Brown would be able to function effectively in a setting that required only limited interaction with unfamiliar others.  He was functioning well in such a setting at home.  (*PageID* 370.)  Dr. Waddell concluded that Brown retained the capacity to complete a variety of tasks that would not require a rapid or consistent pace.  He would be limited to social settings, but could engage appropriately in simple social interactions.  *Id.*

Scioto Paint Valley Mental Health Center.  Brown underwent a mental health assessment on May 3, 2010.  Brown reported feeling depressed and having recurrence of panic attacks, passive suicidal thoughts and feels discouraged and hoopeless.  (*PageID* 339.)  Brown also reported that he was unable to work at that time. He was limited in his daily activities of lifting, standing, sitting in same position; he was "never comfort-able."  (*PageID* 340.)  The intake counselor noted Brown endorsed symptoms of depress-ion including loss of interest, poor sleep, poor appetite, feelings of worthlessness and hopelessness and suicidal thoughts. He had anxiety attacks that included cold sweats and trouble breathing. He felt trapped. He had an increasing number of nightmares.  (*PageID* 342.) Brown was diagnosed with major depression, severe and assigned a  GAF score of 47, indicative of severe symptoms.  (*PageID* 344.)

12

In late June 2010, psychiatrist John Hamill, M.D. completed a functional capacity evaluation for Jobs and Family Services. Dr. Hamill found that Brown was markedly limited in his abilities to maintain attention and concentration for extended periods; perform activities within a schedule, maintaining regular attendance, and being punctual within customary tolerance; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with general public.  Brown was moderately limited in his abilities to remember locations and work-like procedures, understand and remember very short and simple instructions, to carry out very short and simple instructions,  sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others.  (*PageID* 371.) No supporting clinical or psychological test evidence was submitted to support these findings.

On August 9, 2010,  a psychiatrist performed an initial pharmacological management/medication somatic services evaluation. (*PageID* 391-97.)  Brown reported that he no longer had insurance but needed for more oral surgery because he could not keep his upper teeth in his mouth. He was becoming depressed. He also reported suffering

13

from severe chronic pain in his legs, chronic headaches, suicidal thoughts, recurrent nightmares, feelings of hopeless, and fear of going out in public because of panic attacks.  Brown further reported that his brother took him to a Cincinnati Red's ball game, and  his anxiety made him claustrophobic by the second inning. Brown spent his time sitting on patio with his mom; he did not go anywhere or have any interest in doing things.  He no longer saw his friends. He  reported that his memory was poor and his concentration was terrible.  He got irritable around people. They annoyed him, so he just withdrew.  (*PageID* 391.)  Since his motor vehicle accident, Brown had worked at a golf course his brother owned. He did not really work.  It was a way for his brother to give him some money.  He could not work outside due to his breathing problem; and he could not work inside due to his anxiety being around people.  (*PageID* 394.)  Brown was diagnosed with severe major depression, with additional psychotic features as well as a panic disorder and chronic PTSD.  He was assigned with a GAF score of 45. (*PageID* 397.)

On April 13, 2011, his treating psychiatrist noted that Brown's anxiety appears improved but he still has quite a bit of depression and sleep problems.  She increased his Seroquel and continued his other medication.  (*PageID* 381-82.)

On May 31, 2011, Brown discussed his prior accident and facial disfigurement. The therapist noted Brown was "extremely self-conscious and depressed."  At that time, he was living with his parents and felt that he is a burden because he was unable to work and his parents were sick.  He reported he "has very little to live for."  He stayed

14

quite depressed because of his accident and felt that his quality of life was severely limited.  (*PageID* 431.)

Brown reported "feeling somewhat better" on June 27, 2011.  (*PageID* 424.) His dental procedures were scheduled within the month.  Brown was waking up in a panic after nightmares about injury.  *Id*.

On July 13, 2011, due to medication adjustments, Brown noted some improvement with sleeping and pain.  He still had bad days where he felt helpless and worthless.  He had more hope since he had restarted the oral surgeries.  Brown still reported memory loss and noticed his "mind races all the time."  He lost interest in things he was doing and did not focus on them.  He reported no interest in going anywhere. He rarely went out.  (*PageID* 421.)

On August 4, 2011, the therapist observed that Brown was engaged during this session, maintained great eye contact, had great mood, and had normal affect, posture and non-verbal communication.  Brown reported that he just gone to a Cincinnati Red's game and was excited about having gone and the fact that he was able to stay for the game.  (*PageID* 428.)

By October 3, 2011, Brown complained that he was "getting more depressed and forgetful."  He still did not go out in public and reported he "hangs out with his dad most days; family won't let him stay in bed."  He still has terrible nightmares and got suicidal when he had them.  His medication was adjusted and he was encouraged to continue in therapy to work on PTSD issues and to consider group work.  (*PageID* 419.)

15

**Administrative Law Judge's Findings.**  The administrative law judge found that:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2.     The claimant has not engaged in substantial gainful activity since December 1, 2000, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: obesity; status-post remote motor vehicle accident with multiple facial fractures requiring multiple reconstructive surgeries; bilateral hearing loss; post-traumatic stress disorder (PTSD); depressive disorder; and anxiety disorder  (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the [administrative law judge] finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can never lift overhead with his left upper extremity; must work in an environment without concentrated exposure to loud noises or excessive background noise, and must work in an environment that does not require more than occasional verbal communication with the public; claimant is further limited to simple, routine, no more than specific vocational preparation (SVP) 2 type tasks in an environment without fast-paced production or strict time quotas; can interact on only an occasional and superficial basis with co-workers and supervisors; and cannot interact with the general public.

6.     The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on January 10, 1959 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2000, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*PageID* 62-73.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting

17

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**

• <u>Plaintiff argues that the administrative law judge abused his discretion by failing to give proper weight to the opinions of the examining physicians regarding Brown's psychological limitations</u>.  Brown contends that given the consistency of his statements to medical care providers as well as his ongoing medical care, the administrative law judge had no viable basis for discounting the opinions of examiners Drs. Hamill and Reece.  The administrative law judge erred by relying on a review of the record which only contained Dr. Reece's report.  *See* Doc. # 11 at *PageID* 460-65.

• <u>The administrative law judge's determination that Brown can perform work at all exertional levels is unsupported by substantial evidence</u>.  Brown argues that because the state agency did not review the bulk of the records from Dr. Sharma and none of the records from Dr. Jones, his residual functional capacity determination that Brown has no exertional limits other than the left upper extremity is not supported by substantial evidence.  *Id.* at *PageID* 465-67.

**Analysis.**

<u>Mental Impairments</u>

Dr. Hamill is a psychiatrist at Scioto Paint Valley Mental Health Center, where Brown has been treated since May 2010.  In weighing Dr. Hamill's opinion, the admin-

istrative law judge assigned no weight to his opinion, finding that "the records do not include any treatment evidence from this source or indicate that he ever even examined the claimant." (*PageID* 72.)  To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant.  20 C.F.R. § 404.1502.  A court must determine whether or not an ongoing treatment relationship exists at the time the physician's opinion is rendered.  *Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 Fed. Appx. 496, 506 (6th Cir. Feb. 9, 2006) ("[T]he relevant inquiry is . . . whether [claimant] had the ongoing relationship with [the physician] *at the time he rendered his opinion*. [V]isits to [the physician] *after* his residual functional capacity assessment could not retroactively render him a treating physician at the time of the assessment."); *see also Yamin v. Comm'r of Soc. Sec.*, 67 Fed. Appx. 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimant's] condition.").  This is because "the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Here the records from Scioto Paint do not include treatment notes from Dr. Hamill.

Even if Dr. Hamill is not considered a treating physician, substantial evidence supports the administrative law judge's determination.  Dr. Hamill did not reference specific medical findings and/or explain how those medical findings supported the opinion expressed as to the severity of Brown's impairments and the limitations they imposed.  *See McClanahan v. Astrue*, 2011 WL 672059 (S.D. Ohio Feb. 16, 2011) (Barrett,

J.) ("the essential problem with the four pages of forms that make up [the doctor's] opinion is that it is entirely conclusory.  Other than stating that his observations are based on physical exams and history, [the doctor] gives no indication of what evidence his opinion is based on"); *Ball v. Comm'r of Soc. Sec.*, 2010 WL 5885538 (S.D. Ohio Sept. 7, 2010) (Wehrman, MJ) ("where a physician's conclusions regarding a claimant's capacity contain no substantiating medical data or other evidence, the administrative law judge is not required to credit such opinions"); *Wallace v. Astrue*, 10-199 (S.D. Ohio July 14, 2010) (Ovington, MJ) (administrative law judge reasonably did not give controlling or substantial weight to treating physician's opinion where the doctor "provided no reasons in support of her opinions" apart from "listing several diagnoses and noting [the claimant's] 'severe pain'").

Plaintiff also argues that the administrative law judge erred in relying on the opinion of Dr. Waddell because his assessment was not based upon a review of the entire record.  This argument lacks merit.

Social Security Ruling 96-8p requires that the administrative law judge's residual functional capacity assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p further provides:

> In assessing residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5

20

days a week, or an equivalent work schedule), and describe the maximum
amount of each work-related activity the individual can perform based on
the evidence available in the case record.  The adjudicator must also ex-
plain how any material inconsistencies or ambiguities in the evidence in
the case record were considered and resolved.

*Id.*

The administrative law judge is also required to include "a discussion of why

reported symptom-related functional limitations and restrictions can or cannot reas-

onably be accepted as consistent with the medical and other evidence."  *Id.*

Here the administrative law judge based his mental residual functional capacity

determination on the August 2010 recommendations of the medical consultant of the

Bureau of Disability Determination, Dr. Waddell.  (*PageID* 71.)  The administrative law

judge found that this assessment was entitled to significant weight as it was consistent

with Brown's demonstrated memory deficits but satisfactory concentration and per-

sistence.  This assessment also accounts for Brown's ability to interact with providers in

a cooperative manner despite his social anxiety.  *Id.*

In addition to the findings of Dr. Waddell, the administrative law judge relied on

the findings of the consultative psychological examiner, Dr. Reece.  (*PageID* 72.)  Specif-

ically, the administrative law judge gave some weight to Dr. Reece's opinion, except the

marked limitation in stress tolerance.  The administrative law judge determined that it

is not supported considering Brown's ability to perform some work activity until 2010,

his positive interactions with treatment providers, and his ability to drive and go out

alone and by Dr. Reece's clinical data.  *Id.*

21

Plaintiff argues that Dr. Waddell did not have an opportunity to review a significant amount of medical evidence in the record relating to Brown's mental health treatment prior to completing his residual functional capacity assessments, including the treatment records from Scioto Paint Valley Mental Health Center through October 2011. *See* Doc. #11 at *PageID* 464. However, these records do not indicate that Brown suffers from disabling impairments. Notably, on April 13, 2011, his treating psychiatrist at Scioto Paint Valley Mental Health Center said that Brown's anxiety appears improved. (*PageID* 381-82.) Brown reported "feeling somewhat better" on June 27, 2011. (*PageID* 424.) On August 4, 2011, the therapist observed that Brown was engaged during this session, maintained great eye contact, great mood along with normal affect, posture and non-verbal communication. (*PageID* 428.) In addition, there is not an opinion from a treating source indicating the Brown is disabled by his mental impairments after Dr. Waddell's review of the record.

Physical Impairments

Brown contends that he cannot perform work at all exertional levels. He argues that the administrative law judge's residual functional capacity determination is not supported by substantial evidence because the state agency did not review the bulk of the records from Dr. Sharma and none of the records from Dr. Jones.

In determining Brown's physical residual functional capacity, the administrative law judge relied on the assessments of the state agency physicians, Drs. McCloud, Gupta and Hammond. (*PageID* 71.) As noted above, the opinions of non-examining

state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views non-exam-iners "as highly qualified physicians and psychologists who are experts in the eval-uation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p.  Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  See 20 C.F.R. §404.1527(c), (e); *see also* Ruling 96-6p at *2-*3.

The administrative law judge holds the responsibility to weigh the record evid-ence – including medical source opinions – and to determine whether Plaintiff was under a "disability." See 20 U.S.C. §404.1527(d).  The administrative law judge's decis-ion in Brown's case reveals that he weighed the medical source opinions and other evidence of record under the required legal criteria and reasonably concluded that Brown was not under a "disability" as defined by the Social Security Act.  For example, the administrative law judge considered and rejected the opinion of primary care pro-vider Dr.  Sharma – the medical source opinions most favorable to Brown – under the correct legal criteria.  (*PageID* 72.)  Recalling that Dr. Sharma opined that Brown would be limited to perform moderate limitations in various work activities, the administrat-ive law judge rejected those conclusions finding that Dr. Sharma based his assessment on Brown's subjective symptoms rather than the clinical evidence available on examin-ation.  *Id.* §404.1527(c)(2)-(4).  A review of Dr. Sharma's opinion confirms the reason-

23

ableness of the administrative law judge's decision because Dr. Sharma did not explain his opinions in any meaningful detail. Substantial evidence therefore supports the administrative law judge's reasons for not fully crediting this opinion.

In addition, based on the administrative law judge's consideration of the record evidence as a whole, he reasonably concluded that Brown was capable of performing a full range of work at all exertional levels except he can never lift overhead with his left upper extremity; consistent with the limitations in the opinions provided by Drs. McCloud, Hammond, and Gupta. (*PageID* 322-39, 346, 347.) The administrative law judge reasonably relied on these medical source opinions as he believed their opinions were "as consistent with the general lack of objective data of significant physical functional limitations." (*PageID* 71.) Brown argues that their assessments cannot be considered substantial evidence supporting the administrative law judge's residual functional capacity determination because they did not review the entire record. Specifically, Brown argues that the EMG taken of both lower legs on March 23, 2011 was abnormal and revealed a mild right sural mononeuropathy but no radiculopathy, plexopathy, or polyneuropathy. However, when examined the following month in April 2011, Dr. Jones found Brown's hearing to be intact, walking was normal, and despite "give-way weakness of both upper and lower extremities," Dr. Jones thought he had normal strength, bulk and tone, with no atrophy. Dr. Jones felt based on Brown's presentation, he might have restless leg syndrome. (*PageID* #377-79.) A treating physician's diagnosis is not by itself determinative of the ultimate disability determination. *See Simons v. Barnhart,*

114 Fed. Appx. 727, 733-34 (6th Cir. 2004); *see also Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."). The record even reveals improvement in Brown's condition. For example, when seen in follow-up by Dr. Jones on October 2011, he confirmed that Brown was showing some reduction of the burning in his thigh as a result of injections. (*PageID* 438-39.) Also in October 2011, Dr. Sharma noted that Brown was "feeling better," and that his blood pressure, anxiety, and depression were all stable on medication. Hip pain was improving with an injection. Dr. Sharma concluded that Brown "see to be improving with his overall health." (*PageID* 433.)

In addition, the administrative law judge also assigned "some weight" to the opinion of Brown's other primary care provider, Dr. Mosalem, that he saw no physical or mental limitations as of November 2008. (*PageID* 72.) The administrative law judge found this assessment consistent with the normal examination and Brown's lack of complaints at this visit. *Id.*

Accordingly, the undersigned finds that the residual functional capacity as determined by the administrative law judge is supported by substantial evidence. Although the residual functional capacity selected by the administrative law judge might not be the same residual functional capacity that Plaintiff would have selected, the administrative law judge clearly explained his rationale, and the residual functional capacity is, without question, within the permissible "zone of choice" which the Sixth

Circuit discussed in *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir.1994)). The administrative law judge's residual functional capacity is thus not subject to reversal.

**Conclusions.** From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED**.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


 s/Mark R. Abel
United States Magistrate Judge